United States Court of Appeals
Fifth Circuit

**F I L E D**

February 27, 2007

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the F ifth Circuit

m 05-20413

APACHE BOHAI CORPORATION LDC; APACHE CHINA CORPORATION LDC,

Plaintiffs-Appellants,

VERSUS

TEXACO CHINA BV,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
m 4:01-CV-2019

Before JONES, Chief Judge, SMITH and
STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Apache Bohai Corporation and Apache China Corporation (collectively "Apache") appeal a judgment confirming an arbitration award in favor of Texaco China ("Texaco"). Apache argues that the arbitrator exceeded his powers by invalidating an exculpatory clause in the parties' agreement and manifestly disregarded the law by awarding consequential and cost-of-drilling damages and by failing to apply mitigation principles to reduce the award. Because the arbitration clause granted the arbitrator sufficient authority to consider the validity of the exculpatory clause, and because the arbitrator did not ignore any plainly governing principles of applicable law, we affirm.

## I.

In the mid-1990's Texaco entered into production sharing contracts ("PSC's") with the Chinese National Offshore Oil Corporation ("CNOOC") under which Texaco agreed to explore, develop, and produce petroleum from Blocks 9/18 and 11/19 in the Bohai Bay of China in exchange for a share of any petroleum produced. The PSC's divided the exploration period into three phases, each of which required drilling commitments from Texaco. At the end of each phase, Texaco had to elect either to relinquish its entire interest in a block or to continue exploring and relinquish only a portion of its interest.

Texaco had until January 31, 1999, to make an election for Block 9/18 and until June 30, 1999, for Block 11/19. To help meet its drilling commitments, Texaco entered into two farm-in agreements with Apache Bohai's predecessor-in-interest in which Apache agreed to assume Texaco's drilling commitments in return for a 50% share of any future oil production. Apache committed to drill three exploration wells: one on each of Blocks 9/18 and 11/19 and a third on the block of Apache's choice.

In January 1999 Apache and Texaco elected to enter the next phase of exploration on Block 9/18. In March, Apache proposed an area of Block 11/19 to be relinquished so that exploration on it could continue. On June 14, Apache informed Texaco that it was withdrawing from the agreements and would not drill any of the three wells. Texaco had only sixteen days remaining to make an election on Block 11/19 and was saddled with the recently acquired drilling commitment on Block 9/18. Apache tendered its 50% interest in the two blocks to Texaco, although Texaco demanded compliance and refused to accept the tender.

While searching without success for a replacement farm-in company, Texaco secured two three-month extensions of the election deadlines for Block 11/19. During the extensions, Texaco learned from CNOOC that oil had been discovered on a block adjacent to Block 11/19 and that seismic data indicated that the oilfield extended onto Block 11/19. In November 1999 Texaco and CNOOC negotiated a new deal with the following conditions: The exploration well for Block 9/18 could be shifted to Block 11/19; a portion of Block 9/18 containing the oil field was shifted to Block 11/19; a one-year extension was granted for Texaco to decide whether to continue exploring Block 11/19; Texaco released all remaining acreage of Block 9/18; if Texaco chose to continue exploring Block 11/19, it would not be forced to relinquish any further acreage. In December 1999 Texaco accepted Apache's 50% interest in the blocks so it could complete the new deal.

Texaco initiated arbitration proceedings against Apache as provided in the farm-in agreements.[1] The arbitrator determined that

---

[1] The agreements contained the following relevant provisions:

§ 4.03SSNotwithstanding any other provision of the Agreement, neither party shall in any circumstance be liable to the other Party under, arising out of or in any way connected with this Agreement or the Deed of Assignment for any consequential loss or damage whether arising in contract or tort (including negligence)." [the "Exculpatory Clause"]

§ 15.01SSThis Agreement shall be governed by and construed in accordance with the laws of the State of New York, United States of America. [ the "Choice of Law Clause"]

(continued...)

Apache had fundamentally breached its commitment to Texaco in reckless indifference to Texaco's interests. He invalidated the Exculpatory Clause as void under New York law and awarded Texaco over $71 million dollars, of which about $20 million represented consequential damages for Texaco's loss of a 50% interest in Block 9/18, and about $26 million represented direct damages for the cost of drilling the three wells Apache was obligated to drill. The arbitrator did not reduce Texaco's recovery by any alleged gains Texaco had received from the renegotiated deal with CNOOC. The district court confirmed the award.

## II.

We review a district court's confirmation of an award *de novo*, but the review of the underlying award is "exceedingly deferential." *Brabham v. A.G. Edwards & Sons, Inc.*, 376 F.3d 377, 380 (5th Cir. 2004). We vacate an award only for certain statutory grounds, including "where the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(4), or under narrow common law exceptions, such as "manifest disregard for the law" or "contrary to public policy."[2] An award may not be set aside for a mere mistake of fact or law. *Id.*

---

[1](...continued)

§ 15.02SSAny dispute arising out of or relating to this Agreement, including any question regarding its existence, validity, or termination, which cannot be amicably resolved between the Parties shall be settled in New York, New York in accordance with the American Arbitration Association arbitration procedures. [the "Arbitration Clause"]

[2] *See, e.g.*, *Kergosien v. Ocean Energy, Inc.*, 390 F.3d 346, 353 (5th Cir. 2004); *Trans Chem. Ltd. v. China Nat'l Mach. Import & Export Corp.*, 161 F.3d 314, 319 (5th Cir. 1998) (per curiam).

Apache raises two principal arguments for vacation of the award. First, it contends that the arbitrator exceeded his powers by vitiating the exculpatory clause under New York law and awarding consequential damages in the face of the parties' clear contrary intentions. Second, it contends the arbitrator manifestly disregarded New York law by awarding consequential and cost-of-drilling damages and by failing to credit Apache for Texaco's successful mitigation.

## A.

"Arbitration is a matter of contract": The powers of an arbitrator are "dependent on the provisions under which the arbitrators were appointed." *Brook v. Peak Int'l*, 294 F.3d 668, 672 (5th Cir. 2002). Where arbitrators act "contrary to express contractual provisions," they have exceeded their powers. *Delta Queen Steamboat Co. v. AFL-CIO*, 889 F.2d 599, 604 (5th Cir. 1989). If the contract creates a plain limitation on the authority of an arbitrator, we will vacate an award that ignores the limitation.[3]

Where limitations on the arbitrator's authority are uncertain or ambiguous, however, "they will be construed narrowly." *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 343 (5th Cir. 2004). "A reviewing court examining whether arbitrators exceeded their powers must resolve all doubts in favor of arbitration." *Id.*; *Brook*, 294 F.3d at 672. In *Action Industries*, the contract precluded consequential damages in connection with installa-

---

[3] *See Smith v. Transp. Workers Union of Am.*, 374 F.3d 372 (5th Cir. 2004). In *Smith*, where an arbitrator ignored a contractual limitation that "the parties shall not have a right to seek correction of the award," we vacated the arbitrator's modification of the award. *Id.* at 375.

tion, use, or failure of equipment but was silent as to damage limitations for design defects. Finding the contract ambiguous, we upheld an award of consequential damages for a design flaw against a claim that the award exceeded the arbitrators' powers. *Id*.

The farm-in contracts contain a broad arbitration clause covering "any dispute" arising out of the contract, including any questions of validity. Where parties have included broad arbitration clauses, we have upheld awards that invalidated contractual provisions. *See Dole Ocean Liner Express v. Ga. Vegetable Co.*, 84 F.3d 772, 774-75 (5th Cir. 1996). In *Dole*, the agreement stated that "[a]ny dispute, controversy or claim, arising out of or relating to this Contract or a breach thereof, shall be finally resolved by arbitration." *Id.* at 773 n.2. The arbitrator, relying on a Mississippi choice-of-law clause, decided that the liquidated damages provision was unenforceable under Mississippi law. In reviewing the claim that the arbitrator exceeded his powers by invalidating the provision, we concluded that because "the determination of whether the liquidated damages provision was legally enforceable was left to the arbitration panel under the contract, the arbitrators did not 'exceed their powers' by finding, as a matter of law, that it was void." *Id*. at 775.

Apache argues that the first seven words of the Exculpatory Clause, "notwithstanding any other provision in this agreement," take the awarding of consequential damages out of the jurisdiction of the arbitrator. Apache claims that this language creates a supremacy clause, meant to override all other contractual provisions, including the choice-of-law and arbitration clauses. Thus, the arbitrator has no jurisdiction to consider whether New York law would vitiate the effect of the Exculpatory Clause, and he exceeded his powers by considering the issue.[4]

---

[4] The jurisdiction of an arbitrator is a question for the court in the first instance, *Gen. Motors Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 251 (5th Cir. 1998), although "[t]he court may only determine whether the parties intended the particular issue to be resolved by arbitration, the court cannot rule on the potential merits of the underlying claim," *Smith Barney Shearson, Inc. v. Boone*, 47 F.3d 750, 752 (5th Cir. 1995) (citing *AT&T Techs., Inc. v. Comm. Workers of Am.*, 475 U.S. 643, 649 (1986)). Texaco claims that Apache waived the jurisdictional argument by failing to raise it in front of the arbitrator or the district court.

"If a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court. If an argument is not raised to such a degree that the district court has an opportunity to rule on it, we will not address it on appeal." *Belt v. EmCare, Inc.*, 444 F.3d 403 (5th Cir.), *cert. denied*, 127 S. Ct. 349 (2006). Apache's failure to raise the jurisdictional issue before the arbitrator can be explained by the fact that jurisdictional issues were decided by the district court before the arbitration, so "it would be a harsh result to hold jurisdictional challenges waived by failure to present the jurisdictional issue to the arbitrators." *Int'l Bhd. of Elec. Workers, Local Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084 (8th Cir. 2004).

Apache's cryptic references to its jurisdictional argument in its motion to vacate in district court are more troubling, however. Although Apache did present broad allegations that the arbitrator "exceeded his powers" and that the award "failed to draw its essence from the agreement," Apache never specifically alleged that the Exculpatory Clause overrode the Arbitration and Choice-of- Law Clauses, thereby stripping the arbitrator of jur-
(continued...)

4

Apache seeks support in *ASOMA Corp. v. M/V Seadaniel*, 971 F. Supp. 140 (S.D.N.Y. 1997). The factual setting and analysis in that case are helpful, but not in support of Apache's claim.

In *ASOMA*, the parties had signed a limitation of liability clause providing as follows:

> Notwithstanding any other provision in this contract, any claims for damage or loss to cargo shall be governed by Hague-Visby Rules, and any other clause herein repugnant to the Hague-Visby Rules shall be null and void and of no force and effect as respect to cargo claims. . . . Any arbitration clause in this contract shall not apply to claims for cargo loss or damage but such claims shall be brought in the United States District Court for the Southern District of New York, to which jurisdiction Owners hereby consent.

*Id*. at 142. The court observed that the provision removed the issue of cargo claims from the contract's broad arbitration provision, so it refused to compel arbitration. *Id*. at 143. Notably, unlike the Exculpatory Clause under Apache's characterization, the contractual provision at issue in *ASOMA* was not primarily a supremacy clause, but a forum-selection and choice-of-law clause. The parties in *ASOMA*

carved out a set of claims and provided an alternative governing law and decisionmaker. *ASOMA*'s holding, that parties can restrict arbitral jurisdiction by designating alternate decisionmakers for subsets of claims, is in accord with a line of our cases regarding labor contracts.

In *Delta Queen*, we confronted a collective bargaining agreement that provided the company with the sole responsibility to discipline and discharge for proper cause. Because the arbitrator had exceeded his mandate to determine whether the company had proper cause and had proposed to alter the disciplinary decision, we affirmed the district court's vacation of that portion of the arbitrator's decision. *Delta Queen*, 889 F.2d at 604. Later cases interpreting *Delta Queen* have echoed the following logic: If an arbitrator is limited to determining whether an employer showed proper cause for dismissal, and authority to determine discipline is either vested in the company or is non-discretionary, the arbitrator exceeds his powers by fashioning an alternative discipline.[5]

---

[4](...continued)

isdiction to award consequential damages. *See Magistrate Judge's Memorandum and Recommendation*, at 48 ("Nothing suggests that [the arbitrator] exceeded his powers or failed to rationally infer the essence of the contract."). Although Apache's conduct in this litigation has made it a close issue, we conclude that Apache has sufficiently preserved the argument that we will address it on the merits.

[5] *See E.I. duPont de Nemours & Co. v. Local 900 of the Int'l Chem. Workers Union,* 968 F.2d 456, 459 (5th Cir. 1992) (holding arbitrator exceeded authority where submission limited issue to finding proper cause); *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 410-11 (5th Cir. 2003) ("[I]f the relevant bargaining agreement requires just cause for dismissal, an arbitrator acts beyond his jurisdiction by fashioning an alternate remedy once it has concludedSSimplicitly or otherwiseSSthat an employee's conduct constitutes just cause for dismissal"). *See also Weber Aircraft, Inc. v. Gen. Warehousemen & Helpers Union Local 767*, 253 F.3d 821 (5th Cir. 2001) (holding that arbitrator had authority to choose between suspension and termination where the authority was vested in the company to "suspend and/or dis-

As in *ASOMA*, in the cases in which we found an arbitrator had exceeded his powers, he had intruded on an issue that was reserved for an alternative decisionmaker or was removed from anyone's discretion under the contract.[6]

In the Exculpatory Clause in the farm-in agreement there is no indication that the parties did not intend to arbitrate the validity of the Exculpatory Clause.[7] Texaco and Apache did not designate an alternate forum to determine the clause's validity; there is no indication that the parties contemplated any judicial involvement in the contract; and neither party consented to any court's jurisdiction. The farm-in agreement included a very broad arbitration clause covering "any dispute" arising from the agreement, including "any question regarding its . . . validity."

The face of the contract suggests that the parties intended to have the issue of the enforceability of the Exculpatory Clause handled by arbitration. Given the requirement that limitations on an arbitrator's authority must be plain and unambiguous and that we resolve all doubts in favor of arbitration, we will not read a clause that refers neither to arbitration nor to any other method of dispute resolution as precluding arbitral jurisdiction to consider the validity of the clause.[8] The arbitrator did not exceed his powers by considering the validity of the Exculpatory Clause under New York law.

Contrary to Apache's assertion that this reading renders the Exculpatory Clause meaningless, we interpret "notwithstanding any other provision" to control the substantive terms of the contract rather than to designate a decisionmaker for questions of validity. It is a strained interpretation to suggest that the Exculpatory Clause language was evidence of the parties' intention to have a different decision-

---

[5](...continued) charge").

[6] New York, like most states, is an at-will employment regime providing no public policy against terminating an employee for any reason or no reason at all. *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 87 (N.Y. 1983). Under an at-will regime, there is nothing remarkable about removing discretion from any decisionmaker to review an employer's decision to fire an employee, so long as the employee has no contractual claim. The same cannot be said for review of a contractual limitation on consequential damages, where New York public policy finds some such provisions unenforceable. *See Kalisch-Jarcho, Inc. v. New York*, 448 N.E.2d 413 (N.Y. 1983).

[7] Apache properly admitted at argument that a state court or district court reviewing this contract would have the authority to consider the validity of the Exculpatory Clause. Absent plain contractual limitations, arbitrators have the authority to grant any relief that can be given by a court. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995) (upholding punitive damages despite New York law that allowed courts, but not arbitrators, to award such damages, and stating that "it would seem sensible to interpret the 'all disputes' and 'any remedy or relief' phrases to indicate . . . an intention to resolve through arbitration any dispute that would otherwise be settled in a court, and to allow the chosen dispute resol-
(continued...)

---

[7](...continued) vers to award the same varieties and forms of damages or relief as a court would be empowered to award").

[8] *Cf. Buckeye Check Cashing, Inc. v. Cardegna*, 126 S. Ct. 1204 (2006) (upholding arbitrator's jurisdiction to arbitrate a claim that an entire contract, including the arbitration clause, was void for illegality).

maker rule on consequential damages.

Apache raises the alternative claim that the award of consequential damages fails to draw its "essence" from the contract. The "essence" test is an application of the inquiry into whether arbitrators have "exceeded their powers;" it requires that "the award must, in some logical way, be derived from the wording or purpose of the contract." *Kergosien*, 390 F.3d at 353 (citing *Executone Info. Sys. v. Davis*, 26 F.3d 1314, 1324 (5th Cir. 1994)). Under the "essence" test, the "single question is whether the award, however arrived at, is rationally inferable from the contract." *Executone*, 26 F.3d at 1325.

In section 14.05 of the farm-in contract, the parties contemplated that they would be entitled to all remedies arising by law. Once the arbitrator determined that the clause was unenforceable, there was no longer any barrier to awarding consequential damages where they are allowable under New York law.[9] This result is rationally inferable from the contract, so the award satisfies the "essence" test.

### B.

Apache's alternate ground for vacating the award is its claim that the arbitrator manifestly disregarded the law. We recognized "manifest disregard for the law" as a non-statutory ground for vacating an arbitrator's decision in *Williams v. Cigna Fin. Advisors Corp.*, 197 F.3d 752, 759 (5th Cir. 1999): "[P]arties [are] bound by [an] arbitrator's decision not in

'manifest disregard' of the law" (citing *First Options, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). Judicial review under the manifest disregard standard is "extremely limited," however, in line with "our well-established deference to arbitration as a favored method of settling disputes when agreed to by the parties." *Prestige Ford v. Ford Dealer Computer Servs., Inc.*, 324 F.3d 391, 395 (5th Cir. 2003). Manifest disregard "clearly means more than error or misunderstanding with respect to the law." *Id*.

As the Supreme Court has explained,

plenary review by a court on the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final. . . . [I]t is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different than his.

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 598-99 (1960). Although the Court in that case was considering arbitration under a collective bargaining agreement and the Labor Management Relations Act, we have found its analysis and rationale applicable to our FAA decisions and to an arbitrator's interpretation of the law. *See Kergosien*, 390 F.3d at 352 n.2, 357-58.

There are two steps in the manifest-disregard analysis. First, "the error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Id.* at 355. Furthermore, "the term 'disregard' implies that the arbitrator appreciates the existence of a

---

[9] *See Jacada (Europe), Ltd. v. Int'l Mktg. Strategies, Inc.*, 401 F.3d 701, 712-13 (6th Cir.) (upholding award in excess of a damage limitation under the "essence" test where the arbitrator had plausibly determined it was unenforceable), *cert. denied*, 126 S. Ct. 735 (2005).

clearly governing principle but decides to ignore or pay no attention to it." *Id.* The governing law must be "well-defined, explicit, and clearly applicable." *Prestige Ford*, 324 F.3d at 395. For the second step, "before an arbitrator's award can be vacated, the court must find that the award resulted in a significant injustice." *Kergosien*, 390 F.3d at 355.

The parties agree that, in accordance with the choice-of-law provision in their contract, the arbitration is governed by New York law. Apache argues that the arbitrator manifestly disregarded New York law by awarding consequential damages in light of the Exculpatory Clause. The arbitrator found that clause unenforceable as against public policy because Apache (1) acted with reckless disregard for Texaco's rights; (2) intentionally abandoned the contract; and (3) breached a fundamental obligation of the contract. Apache argues that none of these reasons is sufficient under New York law to find the Exculpatory Clause unenforceable.

"[P]arties to a contract have the power to specifically delineate the scope of their liability at the time the contract is formed," and New York courts regularly enforce limitations on liability provisions. *Bd. of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 29 (1987). Under announced New York public policy, however, limitations of liability "will not apply to exemption of willful or grossly negligent acts."[10] Although the public policy was first announced in a series of cases considering delay clauses in construction contracts,[11] in two later cases the New York Court of Appeals considered its application outside that context.

In *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1368 (N.Y. 1992), that court considered an exculpatory clause in a contract that limited liability for any "losses or damages . . . caused by performance or non-performance of obligations imposed by this contract or by negligent acts or omissions." Plaintiff had contracted with defendant to obtain fire-alarm monitoring service and sued after defendant had failed to report a fire signal. The trial court dismissed the case on summary judgment, concluding that the event was a "misadventure" that did not rise to the standard of gross negligence. The Court of Appeals concluded that there was a triable issue of fact and discussed the public policy standard as follows:

> It is the public policy of this state . . . that a party may not insulate itself from damages caused by grossly negligent conduct. . . . . Gross negligence, when invoked to pierce an agreed upon limitation of liability in a commercial contract, must "smack[] of intentional wrongdoing." It is conduct that evinces a reckless indifference to the rights of others. . . .

---

[10] *Kalisch-Jarcho, Inc. v. New York*, 448 N.E.2d 413, 416-18 (N.Y. 1983) (holding that a no damage-for-delay clause would be unenforceable where a party had acted with "bad faith and with deliberate intent").

[11] *See id.* at 416; *Corinno Civetta Constr. Corp. v. City of New York*, 493 N.E.2d 905, 910 (N.Y. 1986) (noting that "[E]ven with such a clause, damages may be recovered for: (1) delays caused by the contractee's bad faith or its willful, malicious, or grossly negligent conduct, (2) uncontemplated delays, (3) delays so unreasonable that they constitute an intentional abandonment of the contract by the contractee, and (4) delays resulting from the contractee's breach of a fundamental right of contract").

8

[The Exculpatory clause] cannot restrict Holmes' liability for conduct evincing a reckless disregard for its customers' rights. . . . .

[P]ublic policy precludes enforcement of contract clauses exonerating a party from its reckless indifference to the rights of others, whether or not termed gross negligence.

*Id*. at 1371 & n.3 (citing *Kalisch-Jarcho*, 448 N.E.2d at 416). The court then remanded for a jury trial on the issue of whether defendant's conduct was recklessly indifferent. *Id*.

Two years later, the court revisited the issue. The contract limited defendant's liability for nonperformance but exempted "willful acts or gross negligence." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 505-06 (N.Y. 1994). A jury found that defendant's actsSSdemanding a contract adjustment and then withdrawing from the contractSSwere "malicious, i.e., the intentional perpetration of a wrongful act injuring plaintiff without justification;" the jury awarded damages. *Id*. at 506. The intermediate appellate court reduced the award and concluded that the willful-act exception in the contract required acts constituting a tort. *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 600 N.Y.S.2d 212, 216 (App. Div. 1993). The Court of Appeals, on review of that decision, concluded that

the phrase "willful acts" should be interpreted here as referring to conduct similar in nature to the "intentional misrepresentation" and "gross negligence" with which it was joined as exceptions to defendant's general immunity from liability for consequential damages. We, therefore, conclude that the term willful acts as used in this

contract was intended by the parties to subsume conduct which is tortious in nature i.e., wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties. As thus defined, limiting defendant's liability for consequential damages to injuries to plaintiff caused by intentional misrepresentations, willful acts and gross negligence does not offend public policy. As we said in *Sommer*, the conduct necessary to pierce an agreed-upon limitation of liability in a commercial contract, must smack of intentional wrongdoing.

*Id*. at 508-09 (citations omitted). The court then concluded that plaintiff's proof showed that defendant's acts were motivated exclusively by economic self-interest, which was insufficient as a matter of law to vitiate the limitation-of-liability provision.

The arbitrator in the instant case, interpreting these decisions, drew support from *Sommer* and concluded that "acting with 'reckless disregard' is sufficient under New York law to vitiate the effect of an exemption clause." Further, he interpreted *Metropolitan Life* as continuing to recognize gross negligence, including reckless disregard, as a ground for voiding a limitation on liability. The prominent positive citation of *Sommer* in *Metropolitan Life* suggests that the court in the later case agreed with the earlier opinion's reasoning.

The arbitrator's interpretation is not so plainly incorrect as to be "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." The arbitrator, whose factual findings

9

are unreviewable,[12] determined that Apache withdrew from the contract in reckless indifference to the interests of Texaco; the arbitrator concluded that finding sufficient to vitiate the Exculpatory Clause. He did not manifestly disregard the law by failing to enforce the Exculpatory Clause and awarding consequential damages to Texaco.

### C.

Apache argues that the arbitrator manifestly disregarded New York law by awarding Texaco cost-of-drilling damages: the cost that Apache would have spent drilling three exploratory wells. Apache claims that the proper measure of Texaco's expectancy damages is the value of the information the wells would have yielded.

In *Chamberlain v. Parker*, 45 N.Y. 569, 571 (1871), defendant breached his covenant to build a well on plaintiff's land. The trial court awarded the plaintiff the cost of drilling the well, an intermediate court reversed, and the New York Court of Appeals affirmed. *Id.* at 570, 574. The court's analysis began with the general rule that, where a party contracts to have a structure built, the measure of damages for breach is the loss of value of the structure or, when that amount is indeterminate or valueless, the value of "the work and labor which the defendant was to perform." *Id.* at 572. On the unique facts of the case, however, the court stated that "[t]he point to be considered is, whether the plaintiff in any sense, actual or legal, has lost by the default of the defendant a sum equal to the expense of digging the well." *Id.* at 572. The court stressed that under the specific facts, the plaintiff was to have no interest in the well. *Id.* at 573. Moreover, "[t]he defendant was not paid for digging a well for the plaintiff on the premises." *Id.*

The arbitrator in the present case concluded that this matter is distinguishable from *Chamberlain*, noting that Texaco would have had a continued interest in the three wells and that Apache's receipt of a 50% interest in the blocks was payment for drilling the wells. The arbitrator then looked to other jurisdictions for guidance.[13] Finding a Louisiana case that he believed was directly on point, the arbitrator elected to adopt that case's measure of damages. In *Fite v. Miller*, 200 So. 285 (La. 1940), plaintiff assigned a one-half interest in his mineral estate to defendant as consideration for defendant's promise to build a well on

---

[12] *See Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509-10 ("When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award. In discussing the courts' limited role in reviewing the merits of arbitration awards, we have stated that courts have no business weighing the merits of the grievance or considering whether there is equity in a particular claim.") (citations omitted); *Kergosien*, 390 F.3d at 358 (same).

[13] Apache also argues that the arbitrator exceeded his powers by relying on law outside the state of New York in contravention of the Choice of Law Clause. The arbitrator looked to caselaw outside New York as persuasive authority after concluding that no New York case squarely controlled. Courts are generally free to look to the decisions of other jurisdictions in determining uncertain or ambiguous questions of New York law. *Elliott Assocs., LP v. Banco de la Nacion,* 194 F.3d 363, 370 (2d. Cir. 1999). Arbitrators "should apply the basic principles of contract law to which the parties have referred" in their choice of law clause. 1 DOMKE ON COMMERCIAL ARBITRATION § 30:5, at 30-7 (Larry Edmonson 3d ed. 2005).

the land. *Id.* at 286. When defendant failed to perform, plaintiff was awarded cost-of-drilling damages. *Id.* at 288. The ideal measure of damages would be the lost profits yielded from the well, but the court held that such damages were too speculative to be proven. *Id.* at 287.

The facts of *Fite* are distinguishable; there the plaintiff never accepted the return of defendant's interest in the land. *Id.* at 289. The *Fite* court implied, and we have held, that if a plaintiff has accepted the return of his consideration he cannot sue for damages.[14] Under the manifest disregard standard, Apache must point to a controlling case with a clear rule ignored by the arbitrator. *Chamberlain* is sufficiently distinguishable that it is not on point, and caselaw from other jurisdictions, even if squarely on point, is not controlling but only persuasive. The arbitrator did not manifestly disregard the law in awarding cost-of-drilling damages.

### D.

Apache urges that the arbitrator manifestly disregarded New York law by failing to apply mitigation principles to reduce Texaco's award. The arbitrator did not reduce the award by the value of any of the following: the knowledge of a discovery extending onto Block 11/19 that Texaco gained from the data provided by CNOOC; the renegotiated deal with CNOOC, which would not have been possible had Apache not reassigned its interests to Texaco; or the interest in the blocks Apache returned. Apache maintains that it should have received credit for each of these items.

The arbitrator acknowledged that under New York law, if any benefit accrues "to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss." *See Stern v. Satra Corp.*, 539 F.2d 1305, 1312 (2d Cir. 1976). The arbitrator then pointed to *G&R Corp. v. Am. Sec. & Trust Co.*, 523 F.2d 1164, 1174 (D.C. Cir. 1975), which holds that for a defendant to be entitled to mitigation, his breach must have made possible a new, favorable transaction, and the profits from that transaction must not be more fairly attributable to the business acumen of the plaintiff. Adhering to that decision, the arbitrator refused to reduce the award in light of the information Texaco received or the new deal Texaco negotiated, because the arbitrator determined that any benefit Texaco gained was more attributable to Texaco's efforts than to Apache's breach.

Apache cites no New York authority that conclusively shows that *G&R* is contrary to New York law. Apache has not demonstrated that the arbitrator manifestly disregarded New York law in refusing to reduce Texaco's award by the value of Texaco's mitigation.

The arbitrator refused to reduce the award in light of the return of Apache's interest in the blocks, because he found that the interest had no inherent worth at the time it was returned.[15]

---

[14] *Fite*, 200 So. at 289-90; *Cockburn v. O'Meara*, 141 F.2d 779 (5th Cir. 1944) (applying Louisiana law and declining to follow *Fite* where plaintiff had accepted return of the land).

[15] Apache argues that this finding creates a logical impossibility in the award. It claims that if Texaco is entitled to $20 million in consequential damages for the loss of its 50% interest in Block 9/18, then Apache's 50% interest should also be valued at $20 million, and Texaco's damages should be offset by that amount.

(continued...)

An arbitrator's finding of fact must be accepted as true. *Manville Forest Prods. Corp. v. United Paperworkers Int'l Union, AFL-CIO*, 831 F.2d 72, 74 (5th Cir. 1987). Because we must defer to his factual conclusion, we cannot say that the arbitrator manifestly disregarded the law in refusing to reduce Texaco's award because Apache had returned its interest in the blocks.

The judgment confirming the arbitration award is AFFIRMED.

---

[15](...continued)

This contention is flawed: The sum of $20 million is the value of the interest had Apache performed; it is therefore a measure of Texaco's loss. By the time it was returned, the interest was worthless; there is no logical impossibility.

Apache also makes the catch-all argument that the award left Texaco in a better position than it would have been in had Apache performed. Apache avers that Texaco should not be able to recover restitution as well as direct and consequential damages. Again, Apache's reasoning rests on the assumption that Apache's interest in the blocks had the same value when Apache received it as it did when Apache reassigned it. The arbitrator, however, found that the interest in the blocks was worthless by the time Apache reassigned it. Texaco did not receive restitution by accepting the reassignment of the blocks, and Apache therefore has failed to demonstrate that Texaco was left in a better position than it would have been in had Apache performed.